David **OSHER**, on behalf of himself and all others similarly situated, Plaintiff,

v.

**JNI CORPORATION, et al.,** Defendants.

No. CIV.01 CV 557–J (NLS).

United States District Court, S.D. California.

Aug. 25, 2003.

---

William S. Lerach, Spencer Alan Burkholz, Milberg Weiss Bershad Hynes and Lerach, Francis Michael Gregorek, Wolf Haldenstein Adler Freeman and Herz, San Diego, CA, Andrew L. Barroway, Schiffrin and Barroway, Bala Cynwyd, PA, Leigh A. Parker, Weiss and Yourman, Los Angeles, CA, for plaintiffs.

Robert .W. Brownlie, Gray Cary Ware and Freidenrich, San Diego, CA, for defendants.

**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT [Doc. No. 105]**

JONES, District Judge.

By order dated March 26, 2003 the Court dismissed Plaintiffs' First Amended Consolidated Complaint ("FACC") without prejudice and with leave to amend. On May 27; 2003 Plaintiffs filed their Second Amended Consolidated Complaint ("SACC"). Defendants move to dismiss the SACC. The Court finds this matter suitable for decision on the papers and without oral argument pursuant to Civil Local Rule 7.2(d)(1).

### Background

### I. Factual History

Plaintiffs represent a class of all purchasers of common stock of JNI Corporation ("JNI") between July 13, 2000 and March 28, 2001 (the "class period"). *SACC* ¶ 1. Plaintiffs allege that JNI's officers and directors conspired to artificially inflate the price of JNI stock during the class period so they could sell off their personal holdings of JNI stock at inflated prices. *Id.* ¶ 3.

JNI designs and supplies Fibre Channel hardware and software products that connect computer servers and data storage devices to form storage area networks ("SANs"). *Id.* ¶ 2. Fibre Channel technology improves data communication speeds, connectivity, distance between connections, reliability and accessibility. *Id.* JNI markets a broad range of Fibre Channel host bus adapters and software products that facilitate advanced SAN device integration and management. *Id.*

JNI's initial public offering ("IPO") occurred in October 1999, at which time its stock was priced at $19 per share. *Id.* ¶ 32. Following the IPO, a parent company known as Jaymark, Inc. held sixty per-

cent of JNI's stock. *Id.* By the summer of 2000, JNI's stock was trading for about $25 per share, down from a prior range of $80–$100 per share. *Id.* ¶ 32. Around this time, Plaintiffs allege that Defendants "devised a scheme to artificially inflate JNI's stock price and distribute their shares in a Secondary Offering." *Id.* ¶ 3. In July 2000 Jaymark reorganized and distributed all its JNI stock to Jaymark's shareholders, including Defendants Wenaas, Terry M. Flanagan, Thomas K. Gregory, Charles McKnett, and John Stiska. *Id.* Pursuant to lock-up agreements, Defendants were limited in the amount of JNI stock they could sell through the Secondary Offering. *Id.* In the weeks prior to Jaymark's reorganization, Plaintiffs claim defendants made false and misleading statements in the form of press releases and statements to analysts. *Id.* ¶¶ 33–36.

On October 25, 2000 JNI completed its Secondary Offering at the price of $74 per share. *Id.* ¶ 46. The Secondary Offering provided net proceeds of $69 million to JNI and $245 million to Jaymark's shareholders, including $32 million to the individual defendants. *Id.* Around the time of the Secondary Offering, Plaintiffs claim Defendants made a number of false and misleading statements designed to inflate the price of JNI stock. *Id.* ¶¶ 41–46. These statements were made (1) during a roadshow in early October 2000, prior to the offering, (2) in a press release dated October 16, 2000, in which Defendants announced JNI's results for third quarter 2000, (3) during a conference call with analysts and investors on October 16, 2000 and (4) in JNI's prospectus issued on October 20, 2000 in connection with the Secondary Offering. *Id.* As a result of Defendants' allegedly false and misleading statements, a number of analysts issued extremely favorable reports on JNI and raised their earning estimates for JNI for the upcoming quarter and fiscal year. *Id.* ¶ 11. JNI's stock price peaked at $126 per share on November 6, 2000. *Id.* ¶¶ 16, 51.

After the Secondary Offering and throughout the remainder of the class period, Plaintiffs claim Defendants continued to make false and misleading statements about JNI's performance and prospects. In November 2000, after unfavorable reports about JNI appeared in the media and JNI's stock's dropped to $63 per share, JNI made statements in a press release and during a conference call which Plaintiffs claim were false or misleading. *Id.* ¶ 59. On December 11, 2000 JNI announced a lower-than-expected range of growth for fourth quarter 2000, causing JNI's stock to drop to $34–3/4 per share. *Id.* ¶¶ 63–64. Plaintiffs claim this announcement was misleading because JNI failed to disclose that results for fiscal year 2001 would also be "significantly lower" than expected. *Id.* ¶ 68. On January 24, 2001 JNI reported its fourth quarter 2000 revenues and lowered its projections for fiscal year 2001, causing JNI's stock price to drop further to $20.06 per share. *Id.* ¶ 69. Plaintiffs claim this announcement was misleading because Defendants projected a strong second half for fiscal year 2001 and used accounting manipulations to inflate the reported results. *Id.* ¶¶ 69–70. Finally, on March 28, 2001 JNI revised its forecast for first quarter 2001 downward and announced that revenues and earnings per share for fiscal year 2001 would be lower than projected. *Id.* ¶ 74. Following this announcement, JNI's stock dropped to $7–3/8 per share, and was trading at around $5 per share at the time the SACC was filed. *Id.* ¶ 75.

## A. Procedural History

In April 2001, six securities fraud actions were filed in this district against JNI and its officers and directors. The Court subsequently consolidated the six related

actions, appointed lead plaintiffs, and ordered lead plaintiffs to file an amended consolidated complaint. *See Order Clarifying Order Granting Motions to Consolidate* (February 21, 2002).

On March 25, 2002 Plaintiffs filed the FACC, naming as defendants JNI, former President and Chief Executive Officer Terry Flanagan, Chief Financial Officer Gloria Purdy, Chief Operating Officer Thomas Gregory, Chief Technology Officer Charles McKnett, JNI Chairman and Jaymark CEO Eric Wenaas, and JNI director John Stiska. *FACC* ¶¶ 22–23. The FACC alleged five claims for relief: (1) violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 against all Defendants, (2) violation of § 20(a) of the 1934 Act against Flanagan, Purdy and Wenaas, (3) violation of § 11 of the Securities Act of 1933 ("1933 Act") against JNI, Flanagan, Purdy, Wenaas, and Stiska, (4) violation of § 12(a)(2) of the 1933 Act against all Defendants and (5) violation of § 15 of the 1933 Act against Wenaas, Flanagan and Purdy. Defendants moved to dismiss the FACC.

By order dated March 26, 2003 the Court granted Defendants' motion to dismiss without prejudice and set forth specific pleading deficiencies for Plaintiffs to correct in an amended complaint. *See Order Granting Motion to Dismiss* (March 26, 2003) at 26–27 (hereinafter, "*March 26, 2003 Order*"). Plaintiffs then moved to lift the automatic discovery stay, seeking discovery of certain documents which they asserted would assist them in drafting an amended complaint which cured the FACC's deficiencies. The Court denied Plaintiffs' motion. *See Order Denying Plaintiffs' Motion to Lift Discovery Stay* (May 21, 2003). On May 27, 2003 Plaintiffs filed the SACC, naming the same defendants and alleging the same five claims. Defendants now move to dismiss the SACC.

## Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss a complaint upon a finding that the plaintiff has failed to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). A 12(b)(6) motion tests the legal sufficiency of the complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001). Dismissal is proper only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See id.* "[I]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed ... whether it is based on an outlandish legal theory or a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (citations omitted). Thus, a court should not dismiss a complaint "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). Finally, the court must accept the complaint's allegations as true and construe the complaint in the light most favorable to the plaintiff. *See Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 338 (9th Cir.1996).

## Discussion

Defendants base their motion to dismiss the SACC on the following arguments: (1) Plaintiffs' Section 10(b) and 20(a) claims do not adequately allege falsity, (2) the Section 10(b) and 20(a) claims do not adequately allege scienter, (3) Plaintiffs' claims under the 1933 Act do not adequately allege falsity with respect to the Registration Statement and Prospectus

and (4) Plaintiffs fail to state a claim for control person liability.

## II. Failure to State a Claim under Section 10(b) and Rule 10b-5

### A. Pleading Requirements for Section 10(b) and Rule 10b-5

■ Section 10(b) of the Exchange Act prohibits the use of any deceptive device in connection with the purchase or sale of securities in contravention of rules prescribed by the Securities and Exchange Commission. *See* 15 U.S.C. § 78j(b). "The provision, as written, does not confine its coverage to deception of a purchaser or seller of securities ... rather, the statute reaches any deceptive device used in connection with the purchase or sale of any security." *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (internal citations omitted). Rule 10b-5 provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, ... [t]o employ any device, scheme, or artifice to defraud, [or] [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied and (5) which proximately caused the plaintiff's injury. *See DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir.2002).

■ In December 1995 Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which mandates that complaints alleging securities fraud must meet the heightened pleading standards of both the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1091 (9th Cir.2002). Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition or mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Through the PSLRA, Congress clarified and strengthened the particularity requirements of Rule 9(b) as applied in the context of federal securities class action lawsuits. The resulting standard requires that the complaint identify (1) each statement alleged to have been misleading, (2) the reason or reasons why the statement is misleading and (3) all facts on which that belief is formed. *Desaigoudar v. Meyercord,* 223 F.3d 1020, 1023 (9th Cir.2000) (citing *In re Silicon Graphics,* 183 F.3d 970, 996 (9th Cir.1999)).

■ Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Wharf Holdings Ltd. v. United Int'l Holdings, Inc.,* 532 U.S. 588, 593, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). With regard to this element, the PSLRA requires complaints alleging securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This language requires the plaintiff to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics,* 183 F.3d at 974. If the plaintiff fails to satisfy the pleading requirements set forth in the Federal Rules and the PSLRA, the latter provides that

"the court shall, on the motion of any defendant, dismiss the complaint[.]" 15 U.S.C. § 78u–4(b)(3)(A).

## B. Alleged False and Misleading Statements

In the March 26, 2003 Order, the Court set forth directives describing the FACC's deficiencies and specifically stating what must be done to cure those deficiencies in the SACC. With respect to statements alleged to be false and misleading, the Court recommended that Plaintiffs amend the pleadings as follows:

(a) For oral statements, indicate when, where, by whom, and under what circumstances the statement was made. If the allegation is not based on personal knowledge, state with particularity all facts upon which plaintiffs formed the belief that one or more defendants made the statement at the time and place at which it is alleged to have been made.

(b) For written statements, identify the document in which it appeared, including the title, author, and date issued, and state with particularity all facts that support plaintiffs' belief that the statement is attributable to defendants.

(c) State with particularity why the statement was false or misleading at the time it was made, and state with particularity all facts upon which plaintiffs formed the belief that the statement was false or misleading.

*March 26, 2003 Order* at 26–27. Defendants contend that Plaintiffs' deficient allegations are largely unchanged in the SACC and that Plaintiffs thus continue to fail to plead falsity adequately.

### 1. *July—September 2000 Statements*

■ As in the FACC, Plaintiffs allege five instances in July 2000 in which Defendants reportedly made false and misleading statements: (1) "On July 12, 2000, JNI announced a certification agreement with Compaq, an OEM [original equipment manufacturer], to supply JNI's products to customers," *SACC* ¶ 33; (2) "On July 17, 2000, JNI reported 'record' second quarter for fiscal 2000 results" and predicted "continued strong growth" and "continued strong demand," *id.* ¶ 34; (3) on July 18, 2000 Bear Stearns issued a favorable report on JNI which "was based on Company specific information provided by … Purdy and Flanagan during a conference call announcing Q200 results," *id.* ¶ 35; (4) also on July 18, DLJ Securities issued a favorable report based on the same conference call, *id.* ¶ 36; and (5) "On September 12, 2000, JNI announced its expectation that third quarter results would be in line with Wall Street estimates and stated that its earnings have 'some potential for upside results.'" *Id.* ¶ 38. Plaintiffs claim these statements were false for two reasons. First, "[a]ccording to former JNI employees, Sun employees were informing JNI employees in the summer of 2000 that demand for JNI's Sun-based products would be declining *which would negatively impact orders for future quarters*[.]" *Id.* ¶ 39(a). The underlined text represents the language added to this allegation in the SACC. Second, "JNI was not making the transition from Sun-based products to PCI products as it was having difficulty developing PCI products that would be accepted by the market to meet its expected growth rate for this part of JNI's business." *Id.* ¶ 39(b). However, the Court finds that the allegations regarding alleged false and misleading statements from July and September 2000 remain deficient.

■ Regarding the July 12 statement, none of the facts alleged in paragraph 39 contradict JNI's representation that it entered into a certification agreement with Compaq. Plaintiffs' description of the July 12 statement also remains inadequate under the PSLRA because it is unclear which Defendant(s), if any, made or were

directly responsible for the statement. Next, the July 17, 2000 press release quote Defendant Flanagan as saying that the second quarter results reflect "continued strong demand for [JNI's] Unix and PC suite of products," that JNI's host bus adapters "continue to dominate in the Fibre Channel storage area network sector at the high-end of the market," and that JNI's sales of PCI-based host bus adaptors "validate[ ] our position as a dominant supplier in the Solaris and Unix market." *Id.* ¶ 34. Plaintiffs allege that this press release was false or misleading because "some [Sun] employees were telling JNI employees about a slowdown for JNI's products, and the newer PCI products were not being accepted by OEMs." *Id.* Although the SACC attempts to comply with the Court's March 26, 2003 Order by adding information regarding how Plaintiffs obtained this information, the SACC still fails to adequately allege the falsity of the press release. Plaintiffs assert that the information that there was a slowdown for JNI's products is inconsistent contemporaneous information which demonstrates that press release contained false and misleading statements. However, even if Sun employees were informing JNI employees that demand for JNI's Sun-based products would be declining, Plaintiffs do not specify the severity or time frame of the alleged decline. A slight to moderate decline might not necessarily undermine JNI's "dominant" position in the market or the "continued strong demand" for its products. The SACC does not "describe, chart or graph" the alleged decline in demand. *See Ronconi v. Larkin,* 253 F.3d 423, 431 (9th Cir.2001).

Moreover, the SACC does not allege facts demonstrating that Defendants knew of the Sun employees' predictions on the date of the press release.[1] Plaintiffs allege that "Sun employees were informing JNI employees ... that demand for JNI's Sun-based products would be declining which would negatively impact orders for future quarters[.]." *SACC* ¶ 39(a). This allegation is insufficient to establish that Defendants received this information. *See Vantive,* 283 F.3d at 1087 (plaintiff must be specific when establishing knowledge). The SACC does not name the Sun or JNI employees, nor does it attempt to quantify the "negative impact." Additionally, there is no indication the predictions of these unidentified Sun employees were so reliable that they should have been credited by Defendants. Thus, contrary to Defendants' assertion, the contemporaneous facts are not alleged in "sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged [press release]." *Vantive,* 283 F.3d at 1085.

■ Plaintiffs further allege the July 17, 2000 press release was false because "JNI was not making the transition from Sun-based products to PCI products." The Court's previous order indicated that this allegation was too vague to demonstrate the press release's falsity. Yet the SACC adds no new allegations to address this deficiency. The SACC does not explain what it means to "make the transition" to PCI products, nor does it set forth facts corroborating the allegation that JNI "was having difficulty developing PCI products that would be accepted by the market." *SACC* ¶ 39(b). General allegations of "problems" and "difficulties" are insufficient to show that Defendants' representations of strong demand were false. *See Ronconi,* 253 F.3d at 434. Specifically, Plaintiffs do not indicate what made JNI's

---

1. Indeed, another section of the SACC suggests that Sun employees did not begin informing JNI employees of the decline in demand for JNI products until August 2000, *after* the date of the press release. *See* SACC ¶ 47(c).

PCI products unacceptable to the market or explain why these vague "difficulties" with the PCI products rendered the press release false.

Finally, the SACC adds the allegation that the July 17, 2000 press release was approved as a "group published" document. *SACC* ¶ 34. Defendants argue that the group published doctrine does not generally apply under the PSLRA. However, the Court will not address this argument because the question of whether the press release is attributable to all individual Defendants is immaterial as Plaintiffs have failed to demonstrate that the press release was false and misleading.

■ Plaintiffs' allegations regarding the two analysts' reports dated July 18, 2000 also remain deficient, as they neither establish the falsity of the reports nor the defendants' liability for those reports. As to the reports' falsity, Plaintiffs add the allegation that the analysts' reports were "based on *Company specific* information provided by defendants, *specifically* Purdy and Flanagan, *during a conference call announcing Q200 results and repeated to the market by the analysts.*" *SACC* ¶ 35–36 (emphasis shows new allegations). However, as in the FACC, the majority of the quoted portions of the press releases merely report historical facts, such as the EPS for second quarter 2000 and JNI's past rates of sequential growth, that are not contradicted by plaintiffs' alleged "true facts." *See id.* ¶¶ 35–36. Plaintiffs claim

that the reports were false and misleading because they failed to disclose that "demand for JNI's Sun-based products would be declining" and because "JNI was not making the transition from Sun-based products to PCI products as it was having difficulty developing PCI products." *Id.* ¶ 39. However, the allegations do not demonstrate the falsity of the analysts' reports for the same reasons that the allegations regarding the July 17, 2000 press release were deficient. Though Plaintiffs indicate that "the information contained in [paragraph 39] was based on interviews with former JNI employees,"[2] the SACC does not identify the former employees, state their former positions in the company, or describe the basis for the employees' knowledge of the events and information.

■ Moreover, Plaintiffs do not allege that Defendants provided this "Company specific" information with the *intent* that the analysts communicate that information to the markets. Plaintiffs merely allege the "reports repeated false of misleading information to the market that was provided by defendants Purdy and Flanagan and served to artificially inflate JNI's stock price." *Id.* ¶ 36. An allegation that Defendants provided information is insufficient to establish intent. *See Silicon Graphics,* 183 F.3d at 983, 985 (plaintiffs must plead particular facts which give rise to a "strong inference" of required state of mind).

2. Plaintiffs repeatedly credit "internal JNI documents and interviews with former JNI employees" throughout the SACC as sources for their allegations. They allege that

JNI's corporate policy precludes employees from retaining company documents after leaving the employment of JNI. Employees are also forced to sign secrecy agreements which restrict their ability to share corporate documents and information. Former employees are also threatened with legal action if they share business information

with persons outside JNI ... Despite these policies ... plaintiffs were able to corroborate from more than one former employee the facts set forth herein[.]

*SACC* ¶ 77. The Court finds that it is hardly surprising that JNI requires, as do most scientific, medical and technology companies, that its employees sign non-compete and non-disclosure agreements. However, this does not excuse Plaintiffs from complying with the PSLRA requirement of alleging sources with greater particularity than is seen here.

With respect to the September 2000 statements, Plaintiffs allege that "[o]n September 12, 2002, JNI announced its expectations that third quarter results would be in line with Wall Street estimates and stated that its earnings have 'some potential for upside results.'" *SACC* ¶ 38. Plaintiffs allege this statement is false and misleading because JNI did not disclose declining demand for Sun-based products and that JNI was not making the transition to PCI. *Id.* ¶ 39. This allegation is unchanged from the FACC and inadequately alleges falsity for the same reasons the allegations regarding the July press release were insufficient. Plaintiffs fail to allege what the announced third quarter results were or what the Wall Street estimates were. There are no facts that show how that this statement was false or misleading.

### 2. *October 2000 statements*

Plaintiffs further claim that Defendants made a number of false statements in October 2000 to artificially inflate JNI's stock prices prior to the October 19, 2000 Secondary Offering. These statements were made (1) in an October 16, 2000 press release announcing JNI's third quarter results, (2) during an October 16, 2000 conference call with investors, analysts and media representatives, (3) during a roadshow to promote the Offering in early October and (4) in the October 20, 2000 prospectus issued in connection with the Offering. *See SACC* ¶¶ 41–42, 44, 46. Again, Plaintiffs provide a long list of alleged false statements, including some block quotes, followed by an equally long list of reasons the statements were false or misleading.[3] Although the Court's previous Order indicated that the Court is left to speculate in matching each statement

with the purported reason it is false or misleading, the SACC makes no changes to address this deficiency.

In the October 16 press release, Defendants reported "record" third quarter results. *SACC* ¶ 41. Plaintiffs block quote several paragraphs of the press release but do not specifically identify the portions alleged to be false or misleading. For the most part, the press release reports factual data, such as percentage increases in sales of certain products. However, it also quotes Flanagan as saying JNI "achieved another sequentially strong quarter, reflecting continued strong demand" for JNI products, and that "we expect continued expansion in revenues" from the FibreStar PCI HBA product group. *Id.* The Court assumes, as it did with the FACC, that these are the statements alleged to be misleading.

Also on October 16, 2000 JNI hosted a conference call for investors, analysts and media representatives, during which Defendants Flanagan and Purdy allegedly made false and misleading statements. *Id.* ¶ 42. According to Plaintiffs,

1. Flanagan stated that revenue would have been even stronger "had we not had some component issues" but component shortages were no longer a problem;

2. Flanagan states that JNI would see "certainly a continued high growth rate if not accelerating growth;"

3. Purdy states PCI sales were down slightly percentage-wise due to higher shipments of newer products which would be certified by the distribution channel and which would make Q400 a "big quarter for JNI;"

---

**3.** Plaintiffs offer ten reasons that span four pages why the five October statements were

false or misleading.

4. Flanagan stated Europe was "late to the SAN market" but was now "very strong" and that the European mix would continue to be 25% and grow "as fast as they are in the U.S.;"

5. Flanagan stated JNI expected the PCI Emerald product to be approved by OEMs "within the next quarter;"

6. Purdy stated JNI was expecting "over the next several quarters [to] prepare for higher volume shipments in Emerald PCI products;" and

7. Purdy stated "I can tell you that the company feels comfortable with current analyst expectations" which were 18–20% growth for Q400. *Id.*[4]

Plaintiffs have attempted to comply with the March 26, 2003 Order by indicating who said what during the conference call and by deleting the reference to "follow-up conversations." *Id.* ¶ 42. Even if these allegations are sufficiently specific under the PSLRA, Plaintiffs are still required to plead facts demonstrating that the statements were false or misleading. However, the new allegations in the SACC do not correct the deficiencies noted in the March 26, 2003 Order. The Court finds the SACC fails to demonstrate the falsity of the statement for the same reasons expressed in the March 26, 2003 Order, *see March 26, 2003 Order* at 9–16, and for the following additional reasons.

▬▬▬ Plaintiffs quote JNI's October 20, 2000 prospectus. *Id.* ¶ 46. The quoted passage summarizes JNI's results for third quarter 2000, gives technical descriptions of JNI's products, and describes JNI's strategy for the future.

Plaintiffs argue that the Registration Statement and Prospectus were false because Defendants were obligated to disclose the "recent adverse developments" set forth in paragraph 47. However, none of those developments contradict the information contained in the quoted passages from the prospectus. Plaintiffs allege that Purdy and Flanagan told analysts that the Company was "comfortable with increasing its revenues on a sequential basis for Q400 and FY01," even though "it was clear from the October data that JNI would not show any sequential growth for Q400 or Q100." *SACC* ¶ 47(e). Having reviewed the SACC, the Court cannot identify a single allegation in which any defendant actually stated or reported to analysts that he or she expected growth of 18–20%. Rather, it appears that the 18–20% figures were generated by the analysts rather than forecast by any of the defendants. The SACC confirms this. "Following the October 19, 2000 offering, two analysts from investment banking firms that co-managed the Secondary Offering issued extremely favorable reports on JNI and raised their earnings estimates for Q400 and FY01 with sequential growth of 18–20% for Q400 and 60–75% growth for FY01." *Id.* ¶ 11. Defendant Purdy stated she was "comfortable" with the analysts' expectations. However, "[s]uch statements have been routinely found by courts to be non-actionable puffery because they are soft expressions of optimism and not a guarantee of performance." *In re Securities Litigation BMC Software, Inc.,* 183 F.Supp.2d 860, 891–92 (S.D.Tex.2001); *see also Raab v. General*

---

4. Plaintiffs also block-quote two analyst reports issued after the conference call. *See SACC* ¶¶ 48–49. However, as discussed above, under the *Cooper* theory of liability for analyst reports, Defendants are not liable for the analyst's statements, but for their own statements made to analysts. *See Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997). Thus, Defendants can only be liable for the analysts' reports to the extent that Defendants' own statements were false or misleading.

*Physics Corp.,* 4 F.3d 286, 291 (4th Cir. 1993) ("[S]tatement that results 'should be in line with analysts' current projections' ... is not a guarantee ... [and] lacks the specificity necessary to make it material.").

Next, although Plaintiffs add the allegation that "[a]ll of the Individual Defendants attended the weekly meetings," *id.* ¶ 47(a), Plaintiffs still fail to specify how and when the Defendants obtained the information discussed or disseminated at the meetings. Moreover, this new allegation is contradicted by the allegation that "defendants, including Purdy, McKnett and Flanagan, traveled to Europe the week of October 2–6 and in the United States during the week of October 9–13, and October 16–19 to meet with institutional investors and money and portfolio managers[.]" *Id.* ¶ 44. Plaintiffs' own allegation indicates that Purdy, McKnett and Flanagan could not have attended the Green Sheet meetings in October. The Court may ignore this inconsistent allegation. *See In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 405 (S.D.N.Y.2001) (court must only accept well-pled facts not contradictory allegations).

Next, Plaintiffs allege for the first time that "[t]he information in ¶ 47 is based on interviews with former JNI employees and internal JNI documents." *SACC* ¶ 47. As discussed above, this allegation does not render the information in paragraph 47 sufficiently specific to rise to the level of particularity required by the PSLRA. Plaintiffs again do not identify the former employees or the internal documents in question.

Plaintiffs further assert that the October 16, 2000 statements were false because JNI was allegedly losing business to a competitor, Emulex. *Id.* ¶ 47(f). Competition from Emulex was a "major concern" and a frequent topic of conversation at the weekly meetings. Plaintiffs allege that an internal email from August 2000 indicates that Flanagan conducted "secret meetings" with Emulex's chief executive officer to discuss the sale of JNI to Emulex. *Id.* ¶ 47(g). However, Emulex is not mentioned in any of the statements alleged to be false or misleading. Thus, as in the FACC, Plaintiffs appear to allege that JNI's failure to disclose the "secret meetings" with Emulex was somehow misleading. An omission is only actionable if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002). The Emulex allegations are essentially unchanged from those in the FACC, and they are inadequate for the reasons discussed in the March 26, 2003 Order.

■ Plaintiffs next allege that the statements were false because, around the time of the offering, one of JNI's "major" OEM customers, Hitachi, was not endorsing JNI's products. *SACC* ¶ 47(h). Hitachi allegedly issued a directive not to purchase JNI's PCI cards because JNI's competitor, Hewlett Packard ("HP"), told Hitachi that JNI had used HP-proprietary data in JNI's products. *Id.* Plaintiffs allege that internal emails demonstrate that Defendants were aware of this issue with Hitachi around the time of the Offering. The SACC clarifies that Defendant Wenaas sent an email to Defendants Stiska, Purdy and Flanagan regarding Hitachi on October 12, 2000. *Id.* Plaintiffs contend, without any supporting details, that Defendants discussed, but decided against, disclosing the Hitachi–HP issue in the Prospectus or in an Amendment because of the "potential negative impact" it might have on the Offering. *Id.*

As discussed in the Court's March 26, 2003 Order, the problem with Hitachi does not necessarily establish that any of De-

fendants' statements were false or misleading. Plaintiffs themselves confirm that JNI had business relationships with numerous OEMs, channel partners and end-users. *See SACC* ¶ 47(c). Thus, even if Hitachi was refusing to endorse JNI's products and Defendants knew about it, Plaintiffs have not pled facts indicating that this problem would necessarily result in material losses for JNI. Alleging that the problem with Hitachi could have a "potential negative impact" is too vague for purposes of proving falsity for purposes of the PSLRA.

Next, with regard to the difficulties with JNI's PCI products, Plaintiffs again have not demonstrated that Defendants' statements were false and misleading. As in the FACC, Plaintiffs allege that Defendants' statements during a conference call and in a press release were false because JNI "was not making a smooth transition from Sun-based products to PCI products" and "was not obtaining enough OEM certifications of its PCI products." *Id.* ¶ 47(i). The press release and conference call statements discuss JNI's expectation of increased development and sales of PCI products. The October 16, 2000 press release indicates that "we expect continued expansion in revenues from [the PCI] product group." *Id.* ¶ 41. As previously discussed, Plaintiffs' allegations regarding JNI's development of PCI products are too vague to be useful. Again, the pleadings do not "explain the significance of obtaining OEM certifications, or indicate how many OEM certifications would be 'enough' to effect a 'smooth transition' to PCI products." *March 26, 2003 Order* at 14. Further, Plaintiffs have again failed to allege facts demonstrating that the difficulties with the PCI products

group were so severe that Defendants *knew* on October 16, 2000 that the products would not be accepted or certified some time during fourth quarter 2000. *See In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1113–14 (D.Nev.1998) (allegations that defendants knew of cost overruns on construction project were insufficient to demonstrate that defendants also knew construction project would ultimately fail).

■ Next, Plaintiffs have again failed to demonstrate the significance of the infamous "Sxxx email." [5] The email does raise an inference that Defendant Purdy knew on October 30, 2000 that the fourth quarter 2000 was "not looking so great." However, as discussed in the March 26, 2003 Order, this does not raise a strong inference that Defendant Purdy knowingly made false statements. Defendant Purdy made the statements in question during the October 16 conference call. The email was circulated on October 30, two weeks after she made the alleged false statements. Thus, the email does not necessarily establish that the fourth quarter was "not looking so great" on October 16, 2000. *See Yourish v. Cal. Amplifier,* 191 F.3d 983, 997 (9th Cir.1999) (temporal proximity of alleged false statement to subsequent disclosure does not necessarily raise strong inference that statement was false when made); *but see Stratosphere,* 1 F.Supp.2d at 1112 ("The shortness of time between later revealed truth and prior statements can be circumstantial evidence that the optimistic statements were false or misleading when made."). Further, as discussed in the Court's March 26, 2003 Order, Purdy's email does not contradict any of Purdy's or Flanagan's alleged state-

---

5. The email, authored by Defendant Purdy on October 30, 2000 and titled "It's a GO!", states in relevant part: "Here's the issue— this quarter is not looking so great—Sxxx. (I'm working on a forecast for the board meeting on Friday) If we're going to miss the numbers—not sure yet, but it's going to be tough ..." *Pritchett Decl.* Ex. N.

ments, except perhaps the statements that "JNI looked forward with confidence," "Q400 would be a big quarter for JNI," and "JNI was expecting to sell high volume of PCI products." The Court has previously determined that such statements are projections or forward-looking statements. As noted by Defendants, the email merely establishes that Defendant Purdy was "not sure yet" if the company was going to "make the numbers"—the email does not serve as adequate proof that Defendant Purdy made knowingly false statements on October 16.

Plaintiffs next allege that as part of a roadshow, Purdy, McKnett and Flanagan traveled to Europe the week of October 2–6, 2000, traveled in the United States the week of October 9–13, and met with institutional investors and money and portfolio managers on October 16–19. *SACC* ¶ 44. During the roadshow, these defendants made "very favorable presentations" about JNI, failed to disclose adverse facts, and represented that "JNI's business was strong and would be showing significant sequential growth." *Id.* These vague allegations are virtually identical to those in the FACC and remain inadequate to plead falsity or scienter under Rule 9(b) and the PSLRA for the reasons stated in the Court's March 26, 2003 Order.

### 3. *November 2000 Statements*

On November 9, 2000 JNI filed its Form 10–Q for the quarter ending September 30, 2000. *Id.* ¶ 52. The 10–Q stated that JNI had historically derived most of its revenue from its "FibreStar host bus adapters designed for the SBus specification" and used by Sun Microsystems in manufacturing its products. *Id.* Further, the 10–Q disclosed JNI's belief that Sun had begun to "phase out the SBus interface in its workstations and low-end servers and may in the future discontinue using the SBus interface in its high-end servers." *Id.* Accordingly, JNI expected that sales of SBus

products would "eventually decline," and sales of its PCI products would "account for an increasing proportion of revenues in the future." *Id.* The 10–Q also reported JNI's third quarter 2000 revenues, and explained that the increase "reflects the increased demand for our products and the continued growth in the market for Fibre Channel products." *Id.* Finally, the 10–Q reported that Defendant Flanagan was planning to retire from his position as CEO, but would "provide consulting services to us for a period of twelve months following his retirement." *Id.*

On November 10, 2000 several unfavorable reports about JNI appeared in the media. One article on *TheStreet.com* questioned JNI's business prospects and suggested that JNI would be edged out by its competitors. *See id.* ¶ 53. Two other articles, which appeared in the *Dow Jones Newswire,* bore the headlines: "JNI Corp. Down 9%; CEO wants to retire"; "JNI Corp. 'Actively Engaged' in Replacing CEO Flanagan"; and "JNI Corp. Frets Over Revenue Tied to Sun Micro Product." *Id.* ¶ 54. That same day, JNI's stock price dropped to $70, when trading was halted at JNI's request. *Id.* ¶¶ 44, 59.

JNI issued a press release on November 10, 2000, confirming Sun's intention to move from SBus servers to PCI servers, but stated that Sun had never "officially announced an end-of-life date" for SBus servers. The press release also stated that SBus sales had actually grown in the past quarter. *Id.* ¶ 57. Plaintiffs also allege that Defendant Purdy said in a *Dow Jones Business News* article that JNI continued to have strong shipments of SBus products, and that Flanagan's retirement had been previously disclosed. *Id.* ¶ 58.

In addition, on November 13, 2000, JNI issued a prepared statement for a conference call stating: (1) that it disagreed with the article on *TheStreet.com;* (2) that the

information portrayed as news in the *Dow Jones* articles—Flanagan's departure and Sun's phasing-out of SBus products—had already been disclosed, and (3) that *Dow Jones* had issued a correction to its articles. *Id.* ¶ 59. Flanagan then stated that his retirement had been previously disclosed, that he planned to serve as a member of JNI's Board of Directors, and that Sun's intention to eventually phase out SBus had been previously disclosed. Flanagan emphasized current SBus sales figures and stated that, based on "all indications in the market today," SBus was "strong and growing." Flanagan further commented that JNI intended to "eventually migrate from SBus to PCI bus as the market dictates." *Id.* At some point, in response to an analyst's question, "defendants" stated that it was "just business as usual at JNI." *Id.*

Plaintiffs allege that the information released in the 10–Q, the press release and the conference call were false and misleading because Defendants did not disclose that "the entire business was deteriorating," *id.* ¶ 60(a), for essentially the same reasons alleged in paragraph 47. "Based on internal data known to defendants since early October, defendants knew JNI would not be able to meet earnings estimates for Q400 and FY01 as previously represented to investors in the October 16, 2000 . . . and November 13, 2000 conference call[s]." *Id.* ¶ 60(d). As discussed above, the allegations in paragraph 47 are insufficient to show falsity.

Plaintiffs also contend that "defendants knew Flanagan was not going to remain at JNI" and that they were "negotiating an exit package with Flanagan that included his departure from the Board." *Id.* ¶¶ 52, 60(b). On November 27, 2000, JNI announced the appointment of a new CEO, *id.* ¶ 61, and Flanagan announced his resignation from the Board of Directors in February 2001. *Id.* ¶ 72. In the March 26, 2003 Order, the Court found that plaintiffs did not explain why they believe defendants knew in early November 2000 that Flanagan was not going to remain at JNI, and that they therefore failed to establish that defendants' statements about Flanagan were false or misleading. The SACC adds the allegation that emails exchanged among Defendants Purdy, Stiska and Wenaas in August 2000 were the source of Defendants' knowledge that Flanagan would not be staying on as a Board member. However, the SACC does not reveal the content of these emails.

Plaintiffs also allege that based on reports from Green Sheet meetings, Defendants knew JNI would not meet earnings estimates for 4Q00 and FY01 "as previously represented to investors." However, the Court is unable to locate any statement in November 2000 in which Defendants purported to project earnings or future revenues, other than soft statements of general optimism. As discussed above, the earnings estimates were analyst-generated and not based by any definite numbers as reported by Defendants.

 Finally, Plaintiffs allege that Defendant Purdy attempted to arrange an illegal transaction designed to get rid of excess inventory and inflate JNI's revenues. "Purdy told Orenich to find a person or company in Taiwan, China, Korea or Hong Kong to purchase excess inventory of JNI's 'Emerald' product. Purdy told Orenich that the company or person did not need the money to purchase the product because JNI would funnel them the money." *Id.* ¶ 60(e). The SACC acknowledges that the transaction was never accomplished. *Id.* Plaintiffs argue that the attempted transaction is proof of Defendants' knowledge that JNI's business was deteriorating. Plaintiffs cite "interviews with former JNI employees, internal JNI documents and legal pleadings filed by Mr.

Orenich in his lawsuit against JNI" as the sources for the information in paragraph 60(e). However, Plaintiffs have again failed to describe these sources with sufficient particularity—they neither name the former employees nor identify specific internal reports, pleadings, or other court documents. *See, e.g. Silicon Graphics*, 183 F.3d at 985 ("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.").

### 4. December 2000 and January 2001 Statements

■ On December 11, 2000, JNI issued a press release "pre-announcing" its expected results for fourth quarter 2000 and fiscal year 2000. *Id.* ¶ 63. Defendant Purdy was quoted as saying JNI was "optimistic" and "expect[ed] earnings per share to range between $0.18 and $0.22." Nevertheless, these results apparently fell short of analysts' expectations of 18–20% sequential growth. *Id.* ¶ 64. After this announcement, JNI's stock price dropped to $34–3/4 per share in high volume trading. *Id.*

Plaintiffs claim these statements were "not a full disclosure of JNI's business problems" because defendants did not disclose that: (1) fiscal year 2001 results would be "significantly lower than estimates"; (2) JNI was failing to obtain OEM certificates for "key" PCI products; and (3) JNI was "accumulating excess inventory due to the continued deterioration of its business." *Id.* ¶ 68. None of these facts establish that JNI's December 11, 2000 press release was false or misleading. Plaintiffs do not allege, for instance, that the figures reported by Purdy were false. Moreover, their allegation that FY01 results would be "significantly lower than estimates" is inadequate because, as discussed above, Plaintiffs have not alleged

sufficient facts to demonstrate that Defendants are responsible for the analysts' estimates.

On January 24, 2001, JNI issued another press release reporting its 4Q00 and FY00 results. *Id.* ¶ 59. The press release describes revenues, earnings per share, and sequential growth rates. Plaintiffs also allege that JNI "disclosed that it was reducing FY01 estimates due to weakness in the Sun-based market and a lack of OEM certifications but still expected strong second half growth for FY01." *Id.* ¶ 69.

■ Plaintiffs first claim this disclosure was misleading because defendants "continued to project a strong second half for FY01 and defendants also failed to disclose that these results were inflated by accounting manipulations." *Id.* ¶ 15. Specifically, Plaintiffs claim JNI should have "taken a write down" of approximately $7.7 million based on excess inventory in fourth quarter 2000, and that JNI's failure to do so was a violation of Generally Accepted Accounting Principles ("GAAP"). *Id.* ¶¶ 69–70. However, Plaintiffs allege that Purdy insisted that the write-down be delayed until a later quarter. *Id.* ¶ 71. The write-down was finally announced in July 2001. *Id.* ¶ 76. Plaintiffs do not allege sufficient corroborating facts for their allegation that Defendants violated GAAP. The March 26, 2003 Order instructed Plaintiffs to explain why the $7.7 million write-down was required by GAAP. When alleging accounting fraud, the complaint must "allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *In re Peerless Sys. Corp. Sec. Litig.*, 182 F.Supp.2d 982, 991–92 (S.D.Cal. 2002) (Lorenz, J.). Plaintiffs failed to amend the pleadings such that the SACC

cures this deficiency—the GAAP violation allegations are virtually unchanged from the FACC. Furthermore, they do not allege facts raising a "strong inference" that Purdy knew the write-down should have been taken in January of 2001. Plaintiffs allege that JNI was "left with excess product" in fourth quarter 2000 due to "decrease in demand for JNI products," but, as noted above, they do not describe the alleged decrease in demand with any particularity. *SACC* ¶ 70. Plaintiffs also allege that there were conversations with Purdy about the write-down during the weekly meetings in late 2000 and early 2001, but they do not identify the specific dates, participants, or substance of these conversations. *See id.* ¶ 71.

 Plaintiffs next argue that the January 24, 2001 disclosure was false or misleading because Defendants included in the results

one million in falsified revenue in a fabricated deal between JNI, Hitachi and Sun Microsystems. In Q400, JNI "sold" one million dollars [worth] of adapters to Hitachi. Hitach "sold" one million dollars [worth] of storage systems to Sun Microsystems, and Sun "sold" a million dollar computer to JNI. JNI showed one million in revenue and showed the computer as a capital investment.

*Id.* ¶ 69. Plaintiffs allege that this "Barney Deal" allowed JNI "to record revenue on a bogus transaction," and they base this knowledge on "legal pleadings filed in Mr. Orenich's lawsuit against JNI, and interviews with former JNI employees." *Id.* As discussed above, Plaintiffs have not provided sufficient specific information about the Orenich pleadings and the former employees such that Plaintiffs may rely on them as sources. Moreover, Plaintiffs do not allege facts that indicate that JNI did not, in fact, purchase a computer from Sun or sell adapters to Hitachi. Enclosing the word "sold" in quotation marks

is insufficient to demonstrate exactly what transpired between these companies or describe how and why this transaction falsified revenues. *See Peerless Systems*, 182 F.Supp.2d at 991 ("A general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation.").

### C. Defendants' Insider Trading

 Plaintiffs also contend that Defendants' insider trading during the class period raises a strong inference of scienter. "If insiders owning much of a company's stock make rosy characterizations of company performance to the market while simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations were false and that they knew it." *Ronconi*, 253 F.3d at 434–35. However, unusual or suspicious stock sales by corporate insiders constitute circumstantial evidence of scienter only if the trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from the undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989)). In evaluating whether insiders' stock sales are unusual or suspicious, courts consider (1) the amount and percentage of shares sold, (2) the timing of the sales and (3) whether the sales were consistent with the insider's prior trading history. *Silicon Graphics*, 183 F.3d at 986. Another factor meriting consideration is whether the insider had any limitations on his or her ability to trade. *See No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir.2003) ("*Am West*").

During the class period, Defendant Flanagan sold 20.76% of his total holdings

that he could sell during the Class Period, including options; Defendant Purdy sold 98.4% of her total holdings, including options; Defendant Gregory sold 21% of his total holdings that he could sell during the Class Period; Defendant McKnett sold 27% of his total holdings that he could sell during the Class Period, including options; Defendant Wenaas sold 98% of his total holdings that he could sell during the Class Period, including options; and Defendant Stiska sold 70% of his total holdings that he could sell during the Class Period. *SACC* ¶ 23; 78.

The Court's previous Order found that Defendants' stock sales did not raise a strong inference of scienter because the amounts sold were not suspicious. *See March 26, 2003 Order* at 21. The SACC addresses this issue by utilizing a lower figure for the total holdings. Specifically, the FACC discussed the percentage in terms of total shares sold during the class period divided by total shares owned, including options. *See FACC* ¶ 23(a)-(f). The SACC discusses the percentage in terms of total shares sold divided by total shares held which were not subject to the lock-up agreement.[6] *SACC* ¶ 79.

Thus, the percentage of shares sold appears higher in the SACC because the denominator is smaller. The following chart shows the different allegations regarding the percentage of stock each Individual Defendant sold both before and during the Class Period.

| Name | Date | FACC | SACC |
| --- | --- | --- | --- |
| T. Flanagan | Class Period | 15.70% | 20.76% |
| | Pre–Class | not alleged | 9.29% |
| G. Purdy | Class Period | 87.00% | 98.48% |
| | Pre–Class | not alleged | 100.00% |
| T. Gregory | Class Period | 21.00% | 21.36% |
| | Pre–Class | not alleged | 17.70% |
| C. McKnett | Class Period | 23.00 | 27.25% |
| | Pre–Class | not alleged | .13.11% |
| E. Wenaas | Class Period | 8.6% | 98.80% |
| | Pre–Class | not alleged | 0.00% |
| J. Stiska | Class Period | 12.00% | 85.44% |
| | Pre–Class | not alleged | 0.00% |
| Totals | Class Period | | 38.17% |
| | Pre–Class | | 12.13% |

*Id.* ¶ 78. Plaintiffs have therefore not alleged any new facts or figures regarding the defendants' trading patterns, and these allegations are deficient for the reasons stated in the Court's March 26, 2003 Order.

In *Ronconi*, the Ninth Circuit held that an insider's sale of 17% of his total holdings was not enough to be suspicious. *See* 253 F.3d at 435. In addition, in *Vantive*, the Ninth Circuit held that an insider's sale of 26% was not "terribly unusual or suspicious, given the complaint's failure to connect [defendant's] sales with any particular allegedly misleading statements." 283 F.3d at 1094. By this standard, the amounts sold by Defendants Flanagan, Gregory and McKnett— 20.76%, 21.36% and 27.25%, respectively— are not suspicious, as Plaintiffs have failed to connect these stock sales to any false or misleading statements.

Defendant Purdy, however, sold 98.48% of her available holdings, which is a suspicious percentage, especially in light of Plaintiffs' allegation that Purdy was the source of several allegedly false statements. However, "large numbers do not necessarily create a strong inference of fraud." *Vantive*, 283 F.3d at 1093. This is especially true when the large numbers are consistent with prior trading. *See Am*

6. Each Defendant received shares from the Jaymark distribution and those shares not sold in the Secondary Offering were subject to a lock-up agreement. *SACC* ¶ 79. The agreement provided that one half of the Jaymark shares not sold in the Secondary Offering were subject to a lock-up period of 180 days from the date of the offering and the remaining shares not sold during the Secondary Offering were subject to a lock-up period of 360 days. *Id.*

*West,* 320 F.3d 920, 938 (9th Cir.2003) ("Insider stock sales are only suspicious when they are dramatically out of line with prior trading practices[.]"). Because Purdy sold 100% of her stock prior to the Class Period, *SACC* ¶ 78, her sales during the class period are not "dramatically out of line." Moreover, it is notable the Purdy only sold a small sum of the shares with which Plaintiffs are concerned—60,000 out of over one million that Plaintiffs claim were sold pursuant to Defendants' scheme.

▆▆▆ As for Defendants Wenaas and Stiska, the Court recognizes that the sale of 98.80% and 85.44% of available stock raises suspicion. The Court also recognizes that Plaintiffs' manipulation of the percentages dramatically increased the numbers for these two Defendants. The FACC alleged that Wenaas only sold 8.6% of his total holdings, including options and that Stiska only sold 12% of his total holdings. *FACC* ¶ 23(e), (f). However, the actual number of shares sold remains the same. *Compare FACC* ¶ 78; *SACC* ¶ 78. As discussed above, the SACC makes it appear that the percentage of total holdings sold has increased, but has not provided the Court with sufficient information to determine the significance of the new percentages. For example, Plaintiffs do not indicate how much stock each Defendant received in the Jaymark distribution, and how much of that stock was sold. The SACC only indicates the stock sales during the Class period which could include already owned stock as well as newly obtained stock. Additionally, the SACC has contradictory allegations regarding Defendant Stiska's stock sales. Early in the SACC Plaintiffs allege Stiska sold 70% of his stock, but later alleges he sold 85.44% of his stock. *Compare SACC* ¶ 23(f); *Id.* ¶ 79.

Moreover, the timing of the sales undermines any inference of suspiciousness, even with respect to Defendants Purdy, Wenaas and Stiska. Defendants sold stock in late July, August, and during the Secondary Offering in October. *See SACC* ¶ 78. In July, Defendants Gregory, McKnett, Wenaas and Stiska sold stock for $42 per share. *Id.* In August, Defendants Flanagan, Purdy, Gregory, and McKnett, sold stock for between $48 and $51 per share. From October 19–23, during the Secondary Offering, each of the Defendants sold stock for $69.93. *Id.* Plaintiffs emphasize that Defendants sold 38% of the stock they actually owned "during the time period when JNI was supposedly enjoying a period of exceptional business success." *Id.* ¶ 82. However, this necessarily means that Defendants *retained* 62% of their holdings. This undermines Plaintiffs' allegation that Defendants were quietly trying to unload their JNI stock.

### D. Summary

For the reasons discussed above and also as stated in the March 26, 2003 Order, Plaintiffs have failed to meet the PSLRA's pleading requirements. First, Plaintiffs have not alleged sufficient facts to demonstrate that any of the quoted statements were false or misleading. Second, Plaintiffs have not alleged sufficient facts to raise a strong inference that Defendants made the statements with actual knowledge, or with deliberate recklessness, that they were false or misleading. Without these corroborating details, the complaint amounts to nothing more than allegations of "fraud by hindsight," which are exactly what the PSLRA was designed to prevent. *See Vantive,* 283 F.3d at 1084–85.

### II. Failure to State a Claim under Sections 11 and 12(a)(2) of the 1933 Act

#### A. Pleading Standards

▆▆▆ Section 11 of the 1933 Act imposes liability for false statements or omissions of material fact in registration state-

ments. *See* 15 U.S.C. § 77k. In order to state a claim under § 11, plaintiffs must allege "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is it would have misled a reasonable investor about the nature of his or her investment." *Stac Elec.*, 89 F.3d at 1403–04 (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir.1994)). There is no requirement of scienter for a § 11 violation. *Id.* at 1404. Section 11 claims are not governed by the heightened pleading standards of the PSLRA, but they are still subject to Rule 9(b)'s requirement that allegations of fraud and mistake be pled with particularity. *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir.2002); *Stac Elec.*, 89 F.3d at 1404–05 (Rule 9(b) applies to § 11 claims grounded in fraud). Section 12(a)(2) imposes liability on sellers of securities if they use certain instruments, including a prospectus, that contain untrue statements or material omissions. *Falkowski*, at 1133–34; 15 U.S.C. § 77*l* (a)(2).

Both these claims are predicated on Plaintiffs' allegations that the Registration Statement and Prospectus issued in connection with the Secondary Offering contained false statements or omitted material facts. As discussed above, however, Plaintiffs have not adequately alleged that any false or misleading statements or omissions were made in conjunction with these documents. Accordingly, Plaintiffs have failed to state a claim under sections 11 and 12(a)(2).

### III. Failure to State a Claim for Control Person Liability

■ Finally, Plaintiffs assert theories of "control person" liability over Defendants Flanagan, Purdy and Wenaas under § 20 of the 1934 Act, 15 U.S.C. § 78t(a), and § 15 of the 1933 Act, 15 U.S.C. § 77*o*. However, because Plaintiffs have failed to state a claim for primary liability under either the 1934 Act or the 1933 Act, these claims must also be dismissed. *See Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir.1999).

### Conclusion and Order

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss. Plaintiffs' Second Amended Consolidated Complaint is dismissed without prejudice and with leave to amend. Plaintiffs are cautioned that no future opportunities to amend the pleadings will be granted. *See Vantive*, 283 F.3d at 1097–98; *Silicon Graphics*, 183 F.3d at 991. Plaintiffs shall file and serve their amended complaint no later than **October 31, 2003**. Plaintiffs shall correct the pleading deficiencies noted herein, bearing in mind the directives issued in the Court's previous order. *See March 26, 2003 Order* at 26–28.

**IT IS SO ORDERED.**